1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9              **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   LUCIOUS WILSON,                      No.  2:23-CV-0977-DC-DMC-P

12              Plaintiff,

13        v.                              FINDINGS AND RECOMMENDATIONS

14   RAMOS, et al.,

15              Defendants.

16

17            Plaintiff, who is proceeding pro se, brings this civil rights action pursuant to 42

18   U.S.C. § 1983.  Pending before the court is Defendants' motion for summary judgment.  See ECF

19   No. 30.  Plaintiff has filed an opposition.  See ECF No. 33. Defendants have filed a reply.  See

20   ECF No. 35.

21            The Federal Rules of Civil Procedure provide for summary judgment or summary

22   adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file,

23   together with affidavits, if any, show that there is no genuine issue as to any material fact and that

24   the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

25   standard for summary judgment and summary adjudication is the same.  See Fed. R. Civ. P.

26   56(a), 56(c); see also Mora v. ChemTronics, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).  One of

27   the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  See

28   Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

                                              1

1          Under summary judgment practice, the moving party

2          . . . always bears the initial responsibility of informing the district court of
           the basis for its motion, and identifying those portions of "the pleadings,
3          depositions, answers to interrogatories, and admissions on file, together
           with the affidavits, if any," which it believes demonstrate the absence of a
4          genuine issue of material fact.

5          Id., at 323 (quoting former Fed. R. Civ. P. 56(c)); see also Fed. R. Civ. P. 56(c)(1).

6          If the moving party meets its initial responsibility, the burden then shifts to the

7    opposing party to establish that a genuine issue as to any material fact actually does exist. See

8    Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

9    establish the existence of this factual dispute, the opposing party may not rely upon the

10   allegations or denials of its pleadings but is required to tender evidence of specific facts in the

11   form of affidavits, and/or admissible discovery material, in support of its contention that the

12   dispute exists.  See Fed. R. Civ. P. 56(c)(1); see also Matsushita, 475 U.S. at 586 n.11.  The

13   opposing party must demonstrate that the fact in contention is material, i.e., a fact that might

14   affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S.

15   242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th

16   Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

17   return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

18   (9th Cir. 1987).  To demonstrate that an issue is genuine, the opposing party "must do more than

19   simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record

20   taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

21   'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).  It is sufficient that "the

22   claimed factual dispute be shown to require a trier of fact to resolve the parties' differing versions

23   of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.

24         In resolving the summary judgment motion, the court examines the pleadings,

25   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.

26   See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed, see Anderson,

27   477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the

28   court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587.

                                        2

1    Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

2    produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

3    Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

4    1987).  Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for the

5    judge, not whether there is literally no evidence, but whether there is any upon which a jury could

6    properly proceed to find a verdict for the party producing it, upon whom the onus of proof is

7    imposed." Anderson, 477 U.S. at 251.

8

9                                    **I.  BACKGOUND**

10           This action proceeds on Plaintiff's original complaint. See ECF No. 1. Plaintiff

11   names the following as defendants: (1) A. Ramos, correctional officer; (2) B. Singh, correctional

12   officer; (3) R. Duran, correctional officer; and (4) Cueva, warden. See id. at 2.

13           Plaintiff alleges that, while in his cell at the California Medical Facility on the night of

14   April 19, 2023, he began experiencing mania due to his bipolar disorder. Id. at 3. He felt distressed

15   hearing homicidal and suicidal voices. Id. Wilson asked correctional officers to see a mental health

16   doctor. Id. He also said he did not want to leave his cell because he did not feel safe around people.

17   Id. Wilson then put paper in the window of the cell to obstruct the vision of those taunting him. Id.

18           Plaintiff contends that correction officers commonly "beat the hell out of" anyone who

19   puts up paper in a cell window and refuses to take it down. Id. After Plaintiff placed paper in the

20   window of his cell, corrections officers ran into Wilson's cell to extract Wilson. Id. at 3, 5. The

21   officers attacked Wilson, who defended himself. Id. at 3. During the encounter, CO Singh and CO

22   Duran used their batons to repeatedly strike Wilson's head. Id. Wilson suffered lacerations to his face

23   and skull. Id.

24           Wilson claims that CO Ramos made a threat, refused Wilson medical and mental

25   health services, and incited the cell extraction altercation. Id. at 3-6. Wilson claims that Ramos as well

26   as CO Singh and CO Duran used excessive force when using their batons during the cell extraction.

27   Id. at 4. Wilson names Warden Cueva as a defendant but makes no direct claims. See id. at 4.

28   / / /

                                         3

1

## II. THE PARTIES' EVIDENCE

2

### A.    Defendants' Motion

3              Defendants' motion for summary judgment is supported by a statement of

4    Defendants' Undisputed Facts ("DUF"), an excerpt of Plaintiff's deposition transcript, the

5    declarations of Defendants Ramos, Singh, and Duran, and the declarations of John Tony Diaz and

6    Rachel Fisher.  See ECF No. 30.

7              Defendants assert the following facts:

8

9    2.      On April 19, 2023, Plaintiff was feeling suicidal and had homicidal
        thoughts.  (ECF No. 1 at p.3.)

10   3.      On April 19, 2023, Plaintiff boarded up his cell windows.  (ECF
        No. 1 at p. 3.)

11

12   4.      Officers Ramos, Duran, and Singh all observed Plaintiff's window
        coverings.  (Ramos Decl. at ¶ 2, Duran Decl. at ¶ 3, Singh Decl. at ¶ 2.)

13   5.      Plaintiff was ordered to take down his window coverings.  (ECF
        No. 1 at p. 3, Ramos Decl. at ¶ ¶ 2, 3, Duran Decl. at ¶ 4, Singh Decl. at ¶
14      2.)

15   6.      Plaintiff refused to take down his window coverings.  (ECF No. 1
        at p. 3, Fisher Decl., Exhibit 2 at 56:14-57:7.)

16

17   7.      Because of Plaintiff's window coverings, custody staff could not
        physically observe Plaintiff.  (Ramos Decl. at ¶ 2, Duran Decl. at ¶ 3,
        Singh Decl. at ¶ 2.)

18

19   8.      Defendant Ramos made the decision to conduct an emergency cell
        extraction for the purpose of a welfare check.  (Ramos Decl. at ¶ 4, Duran
        Decl. at ¶ 5, Singh Decl. at ¶ 3.)

20

21   9.      At no point before officers entered Plaintiff's cell did Plaintiff take
        down the window coverings.  (ECF No. 1 at p. 3, Fisher Decl., Exhibit 2 at
        56:14-57:7.)

22

23   10.     The cell extraction team consisted of Officer Ramos as the shield
        officer, Officer Marquez as key officer, Officer Duran as baton officer,
        Officer Singh as handcuffs officer, and Officer Russel as leg restraints
24      officer.  (Ramos Decl. at ¶ 5, Duran Decl. at ¶ 6, Singh Decl. at ¶ 3.)

25   11.     Officers entered Plaintiff's cell for the purpose of conducting a
        welfare check.  (Ramos Decl. at ¶ 5, Duran Decl. at ¶ 6, Singh Decl. at ¶
26      3.)

27   12.     Plaintiff defended himself when officers entered his cell after he
        refused to take down his cell window coverings.  (ECF No. 1 at p. 3.)

28

13.     Plaintiff struck the shield Officer Ramos was holding when he entered the cell.  (Ramos Decl. at ¶ 6, Duran Decl. at ¶ 7, Singh Decl. at ¶ 4.)

14.     Officer Ramos ordered Plaintiff to stop resisting, yielding negative results.  (Ramos Decl. at ¶ 7, Duran Decl. at ¶ 8.)

15.     Plaintiff knocked the shield out of Officer Ramos's hands.  (Ramos Decl. at ¶ 8, Duran Decl. at ¶ 9, Singh Decl. at ¶ 2.)

16.     Plaintiff jumped on his bed and made forward movement toward the exit of his cell.  (Ramos Decl. at ¶ 9, Duran Decl. at ¶ 10, Singh Decl. at ¶ 6.)

17.     After Plaintiff jumped on his bed, Officer Ramos utilized a forward strike with his fist with an intended target of Plaintiff's right arm, but due to Plaintiff's resistance and movement, made contact with Plaintiff's right forehead area.  (Ramos Decl. at ¶ 10.)

18.     Plaintiff continued to advance toward the exit of his cell after Officer Ramos's first strike.  (Ramos Decl. at ¶ 10.)

19.     Officer Singh then used a closed fist to strike Plaintiff in his right rib area in order to effect custody and restore order.  (Singh Decl. at ¶ 6.)

20.     In response to Officer Singh's first strike Plaintiff thrashed his body, refusing to be restrained.  (Singh Decl. at ¶ 6.)

21.     Next, Officer Ramos wrapped his arm around Plaintiff's upper torso and used physical strength and body weight to try and pull Plaintiff in a downward motion, in an attempt to bring Plaintiff to the floor. (Ramos Decl. at ¶ 11, Duran Decl. at ¶ 10, Singh Decl. at ¶ 7.)

22.     Officer Ramos was unable to bring Plaintiff to the floor.  (Ramos Decl. at ¶ 11, Duran Decl. at ¶ 10, Singh Decl. at ¶ 7.)

23.     Next, Officer Duran used his Monadnock Expendable Baton to deliver a forward strike to Plaintiff's abdomen while simultaneously ordering Plaintiff to stop resisting and get down on the bed.  (Duran Decl. at ¶ 11.)

24.     Plaintiff did not get down on the bed as ordered, so Officer Duran attempted to wrap his arms around Plaintiff's legs.  (Duran Decl. at ¶¶ 11, 12.)

25.     Plaintiff used his left leg to kick Officer Duran in his face and knock off his safety helmet.  (Ramos Decl. at ¶ 11, Duran Decl. at ¶ 12, Singh Decl. at ¶ 7.)

26.     Officer Duran was diagnosed with a concussion as a result of this contact by Plaintiff.  (Duran Decl. at ¶ 14.)

27.     Next, Officer Duran was able to grasp Plaintiff's upper torso and continued to pull Plaintiff in a downward motion, forcing Plaintiff into a prone position on the bed.  (Ramos Decl. at ¶ 2, Duran Decl. at ¶ 12.)

5

1    28.    Plaintiff continued to resist and thrash his body while Officers
      Ramos and Singh were trying to secure hand restraints on Plaintiff.
2    (Ramos Decl. at ¶ 12, Duran Decl. at ¶ 12.)

3    29.    Because Plaintiff was resisting being handcuffed and thrashing his
      body, Officer Duran used his baton to strike Plaintiff in the right shoulder
4    blade.  (Duran Decl. at ¶ 13.)

5    30.    The strike was effective, and Officers Ramos and Singh were able
      to secure Plaintiff's hands behind his back in handcuffs.  (Ramos Decl. at
6    ¶ 2, Duran Decl. at ¶ 13, Singh Decl. at ¶ 8.)

7    31.    Once Plaintiff was in hand and leg restraints he stopped resisting.
      (Ramos Decl. at ¶ 12, Duran Decl. at ¶ 13, Singh Decl. at ¶ 9.)

8
      32.    Once Plaintiff stopped resisting, Officers Ramos, Duran, and Singh
9    stopped all use of force and turned over custody of Plaintiff to other
      officers on the scene.  (Ramos Decl. at ¶ 12, Duran Decl. at ¶ 13, Singh
10   Decl. at ¶ 9.)

11   33.    A medical evaluation and CDCR 7219 was completed for Plaintiff.
      (Fisher Decl., Exhibit 1.)

12
      34.    The form indicated that Plaintiff said, "'hearing voices' I can
13   disclose that."  (Fisher Decl., Exhibit 1.)

14   35.    The form noted swelling, pain and a 2 cm × 0.4 cm cut at
      Plaintiff's right eyebrow and a 1.5 cm × 0.5 cm cut on his left knee.
15   (Fisher Decl., Exhibit 1.)

16   ECF No. 30-8, pgs. 2–6.

17   **B.    Plaintiff's Opposition**

18        Plaintiff has filed an opposition to the motion.  See ECF No. 33. In Plaintiff's

19   supplemental opposition, Plaintiff admits some facts surrounding the extraction, while disputing

20   others.  See ECF No. 33.  Those admitted facts are as follows:

21   Facts Admitted

22   2.    On April 19, 2023, Plaintiff was feeling suicidal and had homicidal
      thoughts.  (ECF No. 1 at p.3.)

23
      3.    On April 19, 2023, Plaintiff boarded up his cell windows.  (ECF
24   No. 1 at p. 3.)

25   4.    Officers Ramos, Duran, and Singh all observed Plaintiff's window
      coverings.  (Ramos Decl. at ¶ 2, Duran Decl. at ¶ 3, Singh Decl. at ¶ 2.)

26
      5.    Plaintiff was ordered to take down his window coverings.  (ECF
27   No. 1 at p. 3, Ramos Decl. at ¶ ¶ 2, 3, Duran Decl. at ¶ 4, Singh Decl. at ¶
      2.)

28

6

6.      Plaintiff refused to take down his window coverings. (ECF No. 1 at p. 3, Fisher Decl., Exhibit 2 at 56:14-57:7.)

9.      At no point before officers entered Plaintiff's cell did Plaintiff take down the window coverings. (ECF No. 1 at p. 3, Fisher Decl., Exhibit 2 at 56:14-57:7.)

10.     The cell extraction team consisted of Officer Ramos as the shield officer, Officer Marquez as key officer, Officer Duran as baton officer, Officer Singh as handcuffs officer, and Officer Russel as leg restraints officer. (Ramos Decl. at ¶ 5, Duran Decl. at ¶ 6, Singh Decl. at ¶ 3.)

14.     Officer Ramos ordered Plaintiff to stop resisting, yielding negative results. (Ramos Decl. at ¶ 7, Duran Decl. at ¶ 8.)

21.     Next, Officer Ramos wrapped his arm around Plaintiff's upper torso and used physical strength and body weight to try and pull Plaintiff in a downward motion, in an attempt to bring Plaintiff to the floor. (Ramos Decl. at ¶ 11, Duran Decl. at ¶ 10, Singh Decl. at ¶ 7.)

22.     Officer Ramos was unable to bring Plaintiff to the floor. (Ramos Decl. at ¶ 11, Duran Decl. at ¶ 10, Singh Decl. at ¶ 7.)

24.     Plaintiff did not get down on the bed as ordered, so Officer Duran attempted to wrap his arms around Plaintiff's legs. (Duran Decl. at ¶ ¶ 11, 12.)

25.     Plaintiff used his left leg to kick Officer Duran in his face and knock off his safety helmet. (Ramos Decl. at ¶ 11, Duran Decl. at ¶ 12, Singh Decl. at ¶ 7.)

26.     Officer Duran was diagnosed with a concussion as a result of this contact by Plaintiff. (Duran Decl. at ¶ 14.)

31.     Once Plaintiff was in hand and leg restraints he stopped resisting. (Ramos Decl. at ¶ 12, Duran Decl. at ¶ 13, Singh Decl. at ¶ 9.)

32.     Once Plaintiff stopped resisting, Officers Ramos, Duran, and Singh stopped all use of force and turned over custody of Plaintiff to other officers on the scene. (Ramos Decl. at ¶ 12, Duran Decl. at ¶ 13, Singh Decl. at ¶ 9.)

33.     A medical evaluation and CDCR 7219 was completed for Plaintiff. (Fisher Decl., Exhibit 1.)

34.     The form indicated that Plaintiff said, "'hearing voices' I can disclose that." (Fisher Decl., Exhibit 1.)

ECF No. 33, pgs. 8-9.

/ / /

/ / /

/ / /

1

Facts Denied

2          Plaintiff denies the remainder of the facts outlined in Defendant's separate

3    statement.  These denials fall into two categories: (1) Defendants' purpose for entering the cell,

4    and (2) Plaintiff's interaction with Defendants during the extraction.  See id.

5          Regarding Defendants' purpose for entering the cell, Plaintiff claims that

6    Defendants entered the cell to engage in violent conduct and not to perform a welfare check on

7    Plaintiff.  See id at 8.  Plaintiff claims that if Defendants' purpose was to conduct a welfare check

8    on Plaintiff, they could do so through a food port check, which could be accomplished by holding

9    a transparent shield against the food port and looking inside the food port, and there was no need

10   for Defendants to enter the cell and engage in physical contact with Plaintiff.  See id.

11         Regarding Plaintiff's interaction with Defendants during the extraction, Plaintiff

12   claims that he defended himself after Defendant Duran bashed him in the head with a baton.  See

13   id.  Plaintiff asserts that after Defendants entered the cell, Defendant Ramos attempted to smash

14   Plaintiff against the wall at the back of the cell, and Plaintiff put out his hands to prevent being

15   crushed.  See id.  Plaintiff claims that Defendant Ramos subsequently dropped his shield after he

16   realized he could no longer push Plaintiff forward due to Plaintiff's resistance.  See id. at 9.

17   Plaintiff asserts that he then jumped on his bed to make it harder for Defendant Duran to strike

18   him in the face with a baton, and his intention was never to escape prison.  See id.  Plaintiff

19   denies that Defendant Ramos punched him in the head and claims that the wound in his right

20   forehead area was left by a baton.  See id. at 5, 9.  Plaintiff denies that Defendant Singh struck

21   him in his right rib area and Plaintiff thrashed his body in response.  See id. at 9.  Plaintiff denies

22   that Defendant Duran struck him in the abdomen and asserts that Defendant Duran instead struck

23   Plaintiff above his right eye.  See id.  Plaintiff denies that Defendant Duran forced Plaintiff into a

24   prone position on the bed and that Plaintiff continued to resist. Plaintiff further denies that

25   Defendant Duran had to strike Plaintiff in the right shoulder blade with a baton before Defendants

26   Ramos and Singh could secure Plaintiff's hands in handcuffs.  See id.

27   / / /

28   / / /

8

1                                **III.  DISCUSSION**

2          Defendants argue that summary judgment is appropriate because: (1) the force

3   used by Defendants was not applied maliciously and sadistically; and (2) Defendant is entitled to

4   qualified immunity.  See ECF No. 30, pg. 1.  For the reasons discussed below, the Court finds

5   Defendant's arguments unpersuasive, and Defendant's are not entitled to the requested relief.

6          **A.      Plaintiff's Excessive Force Claim**

7          This case proceeds on Plaintiff's excessive force claim against Defendants brought

8   under the Eighth Amendment. See ECF No. 17.

9          The treatment a prisoner receives in prison and the conditions under which the

10  prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel

11  and unusual punishment.  See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan,

12  511 U.S. 825, 832 (1994).  The Eighth Amendment ". . . embodies broad and idealistic concepts

13  of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102

14  (1976).  Conditions of confinement may, however, be harsh and restrictive.  See Rhodes v.

15  Chapman, 452 U.S. 337, 347 (1981).  Nonetheless, prison officials must provide prisoners with

16  "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy,

17  801 F.2d 1080, 1107 (9th Cir. 1986).  A prison official violates the Eighth Amendment only when

18  two requirements are met: (1) objectively, the official's act or omission must be so serious such

19  that it results in the denial of the minimal civilized measure of life's necessities; and (2)

20  subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of

21  inflicting harm.  See Farmer, 511 U.S. at 834.  Thus, to violate the Eighth Amendment, a prison

22  official must have a "sufficiently culpable mind."  See id.

23          When prison officials stand accused of using excessive force, the core judicial

24  inquiry is ". . . whether force was applied in a good-faith effort to maintain or restore discipline,

25  or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992);

26  Whitley v. Albers, 475 U.S. 312, 320-21 (1986).  The "malicious and sadistic" standard, as

27  opposed to the "deliberate indifference" standard applicable to most Eighth Amendment claims,

28  is applied to excessive force claims because prison officials generally do not have time to reflect

                                        9

1    on their actions in the face of risk of injury to inmates or prison employees.  See Whitley, 475

2    U.S. at 320-21.  In determining whether force was excessive, the court considers the following

3    factors: (1) the need for application of force; (2) the extent of injuries; (3) the relationship

4    between the need for force and the amount of force used; (4) the nature of the threat reasonably

5    perceived by prison officers; and (5) efforts made to temper the severity of a forceful response.

6    See Hudson, 503 U.S. at 7.  The absence of an emergency situation is probative of whether force

7    was applied maliciously or sadistically.  See Jordan v. Gardner, 986 F.2d 1521, 1528 (9th Cir.

8    1993) (en banc). The lack of injuries is also probative.  See Hudson, 503 U.S. at 7-9.  Finally,

9    because the use of force relates to the prison's legitimate penological interest in maintaining

10   security and order, the court must be deferential to the conduct of prison officials.  See Whitley,

11   475 U.S. at 321-22.

12            In the pending motion for summary judgment, Defendants argue that the force

13   used was not applied maliciously and sadistically.  See ECF No. 30-1, pg. 5. More specifically,

14   Defendants argue that their use of force was warranted because they were attempting to subdue

15   Plaintiff's attack and restore order.  See id.  The Court disagrees and finds there is a genuine issue

16   of material fact.  Plaintiff and Defendants dispute whether the circumstances warranted an

17   emergency cell extraction, whether Plaintiff actively attacked Defendant Ramos or was acting in

18   self-defense, whether Plaintiff attempted to escape his cell, and the specific cause of the wound in

19   Plaintiff's right forehead area, all of which are questions important in determining whether

20   Defendants' use of force on Plaintiff was reasonable under the circumstances.  See ECF No. 33 at

21   8-9. Therefore, there exist triable issues of fact that render summary judgment inappropriate in

22   this case.

23            **B.**    **Qualified Immunity**

24            Government officials enjoy qualified immunity from civil damages unless their

25   conduct violates "clearly established statutory or constitutional rights of which a reasonable

26   person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In general,

27   qualified immunity protects "all but the plainly incompetent or those who knowingly violate the

28   law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).  In ruling upon the issue of qualified

1    immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting the

2    injury, the facts alleged show the defendant's conduct violated a constitutional right.  See Saucier

3    v. Katz, 533 U.S. 194, 201 (2001).  If a violation can be made out, the next step is to ask whether

4    the right was clearly established.  See id.  This inquiry "must be undertaken in light of the specific

5    context of the case, not as a broad general proposition . . . ."  Id.  "[T]he right the official is

6    alleged to have violated must have been 'clearly established' in a more particularized, and hence

7    more relevant, sense:  The contours of the right must be sufficiently clear that a reasonable

8    official would understand that what he is doing violates that right."  Id. at 202 (citation omitted).

9    Thus, the final step in the analysis is to determine whether a reasonable officer in similar

10   circumstances would have thought his conduct violated the alleged right.  See id. at 205.

11          When identifying the right allegedly violated, the court must define the right more

12   narrowly than the constitutional provision guaranteeing the right, but more broadly than the

13   factual circumstances surrounding the alleged violation.  See Kelly v. Borg, 60 F.3d 664, 667 (9th

14   Cir. 1995).  For a right to be clearly established, "[t]he contours of the right must be sufficiently

15   clear that a reasonable official would understand [that] what [the official] is doing violates the

16   right."  See Anderson v. Creighton, 483 U.S. 635, 640 (1987).  Ordinarily, once the court

17   concludes that a right was clearly established, an officer is not entitled to qualified immunity

18   because a reasonably competent public official is charged with knowing the law governing his

19   conduct.  See Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982).  However, even if the plaintiff

20   has alleged a violation of a clearly established right, the government official is entitled to

21   qualified immunity if he could have ". . . reasonably but mistakenly believed that his . . . conduct

22   did not violate the right."  Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001); see

23   also Saucier, 533 U.S. at 205.

24          The first factors in the qualified immunity analysis involve purely legal questions.

25   See Trevino v. Gates, 99 F.3d 911, 917 (9th Cir. 1996).  The third inquiry involves a legal

26   determination based on a prior factual finding as to the reasonableness of the government

27   official's conduct.  See Neely v. Feinstein, 50 F.3d 1502, 1509 (9th Cir. 1995).  The district court

28   has discretion to determine which of the Saucier factors to analyze first.  See Pearson v. Callahan,

1   555 U.S. 223, 236 (2009).  In resolving these issues, the court must view the evidence in the light

2   most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff.  See

3   Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

4              In Defendants' motion for summary judgment, Defendants argue that they are

5   entitled to qualified immunity because: (1) Defendants did not violate Plaintiff's constitutional

6   rights; and (2) Defendants could not have recognized, under the circumstances, that their actions

7   violated clearly established constitutional rights.  See ECF No. 30-1, pg. 17.  The Court finds that

8   Defendants' arguments are not persuasive.  Viewing the evidence in the light most favorable to

9   Plaintiff, a jury could conclude that Plaintiff was not attempting to fight officers or escape cell,

10  and that as Defendants struck Plaintiff repeatedly on the head with a metal baton, Defendants

11  violated Plaintiff's constitutional rights.  Additionally, on the current record, a jury could find that

12  a reasonable officer would have been aware that their actions violated Plaintiff's rights.  Given

13  the factual determinations which remain to be made, the Court cannot at this point find that

14  Defendant is entitled to qualified immunity as a matter of law.

## V.  CONCLUSION

16             Based on the foregoing, the undersigned recommends that Defendant's unopposed

17  motion for summary judgment, ECF No. 30, be DENIED.

18             These findings and recommendations are submitted to the United States District

19  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

20  after being served with these findings and recommendations, any party may file written objections

21  with the court.  Responses to objections shall be filed within 14 days after service of objections.

22  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v.

23  Ylst, 951 F.2d 1153 (9th Cir. 1991).

24

25  Dated:  July 15, 2025

26                                              _____
                                                DENNIS M. COTA
27                                              UNITED STATES MAGISTRATE JUDGE

28

12